IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 19-cr-00531-WJM

UNITED STATES OF AMERICA,

   Plaintiff,

v.

IRMA ZAMORANO,

   Defendant.

---

## MOTION TO RECONSIDER PRETRIAL DETENTION ORDER
## UNDER 18 U.S.C. § 3142(i)

---

Irma Zamorano, through undersigned counsel, respectfully asks this Court to reconsider the detention order entered on December 11, 2019, ECF No. 11, and to temporarily release her. This Court has the power to release Ms. Zamorano for a compelling reason. *See* 18 U.S.C. § 3142(i). The COVID-19 public health crisis is such a compelling reason.[1]

The World Health Organization declared COVID-19 a pandemic. The virus has hospitalized and killed thousands, affecting elderly and medically-compromised individuals most profoundly. On April 1, 2020, the Jefferson County Sheriff's Office issued a statement confirming that a deputy assigned to the jail where Ms. Zamorano is incarcerated tested positive for COVID-19.[2] Counsel has further confirmed that a staff member at the Jefferson County Public Defender also tested positive

---

[1] Counsel attempted to confer with the government, but has not received a response as to their position on this motion.

[2] *Coronavirus in Colorado: Latest COVID-19 Updates,* The Denver Channel, https://www.thedenverchannel.com/news/coronavirus/coronavirus-in-colorado-latest-covid-19-updates-from-april-1-2020

for the virus. Ms. Zamorano is medically compromised. Under the circumstances, the risk of COVID-19 to Ms. Zamorano is hardly speculative.

## I.      Summary of the Argument.

Temporary pretrial release should be ordered for the compelling reason that it will protect Ms. Zamorano, the prison population, and the wider community during the COVID-19 pandemic. There is already COVID-19 within the Jefferson County detention center, and Ms. Zamorano's age (48), recent surgery, chronic pain, and morbid obesity make her particularly medically vulnerable to COVID-19. Ms. Zamorano has a verified plan for release that should be implemented in light of these new and compelling developments.

## II.      Factual and Procedural Background.

On December 5, 2019, Ms. Zamorano was riding as a passenger in her son-in-law's car. Ms. Zamorano and her family were traveling from their homes in Banos, California to the Minneapolis area of Minnesota. After Colorado State Patrol received an anonymous tip that the car Ms. Zamorano was traveling in was transporting narcotics, police stopped the car for allegedly violating traffic laws.  The constitutionality of that stop has not yet been determined. After the stop, Ms. Zamorano admitted to possessing methamphetamine found in the car. On December 18, 2020, the government indicted Ms. Zamorano for a single count of possession with intent to distribute a controlled substance, a mixture of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii).

On December 11, 2020, this Court (Magistrate Judge Crews) held a contested detention hearing. Although the Court noted that it "struggled with [the] decision," Ms. Zamorano was ordered detained. This Court found the government had met its burden of showing that "no condition or combinations of conditions will reasonably assure the defendant's attendance as

required," but expressed particular concern about several issues—namely 1) the weight of the evidence against Ms. Zamorano; and 2) her lack of ties to Colorado and inability to drive from her residence in California to Colorado.[3]

Ms. Zamorano has entered a not guilty plea and the motions filing deadline in her case is presently set for April 6, 2020.

### III.   Events Since December 11, 2020 Undermine this Court's Justification for Detaining Ms. Zamorano and Create a Pressing Need for her Release.

Circumstances have changed since Ms. Zamorano's detention hearing in two significant ways. First, she has a *verified* and stable residence in California as well as transportation to that residence from Colorado, and from California back to the District of Colorado, as needed. Two parties, Ms. Zamorano's daughter, Anahi Ibanez, and Ms. Zamorano's partner, Jose Luna, are willing to serve as a third party custodians for Ms. Zamorano. These facts were not previously before this Court.

Second, after Ms. Zamorano's detention hearing, COVID-19 caused a global pandemic.[4] The world remains in the throes of this pandemic. The United States has more confirmed cases than any other country.[5]  Colorado has over 2,300 confirmed cases.[6] Government officials at every level

---

[3] At the detention hearing, the Court found there was not a rebuttable presumption under 18 U.S.C. § 3142(e). Subsequently, the government filed an Indictment and that presumption now applies pursuant to 18 U.S.C. § 3142(f)(1).

[4] *Coronavirus Disease (COVID-19) Pandemic*, World Health Organization (March 10, 2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019.

[5] *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, March 27, 2020, https://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6 (updated regularly).

[6] *Coronavirus in the U.S.: Latest Map and Case Count*, New York Times (March 30, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&module=RelatedLinks&pgtype=Article (updated regularly).

have declared states of emergency, including in Colorado.[7]

As the Second Circuit recently explained, COVID-19 presents a "dramatic challenge" and "the impact of this recent emergency on jail and prison inmates, their counsel (in the lead, the Federal Defenders), the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring."[8] On April 1, 2020, the Federal Public and Community Defenders Legislative Committee wrote to Attorney General William Barr outlining the dangers facing the inmate populations we represent: "A chorus of public health experts has confirmed that immediate decarceration is necessary to avoid a humanitarian crisis in our prisons and jails." Exhibit A.

### 1. This Court Need Not Be Concerned About Ms. Zamorano's Living Situation in California – It Has Been Verified.

At Ms. Zamorano's detention hearing, the probation department recommended release but had not yet had time to verify a number of details about Ms. Zamorano's release plan. Det'n Hearing Trans, Doc. 17. In seeking detention, the government cast aspersions on the family members with whom Ms. Zamorano intended to reside, and the Court, understandably, questioned the specifics of that arrangement. The government seemed to suggest that Ms. Zamorano's daughter, Anahi Ibanez, was suspected of drug trafficking because she had been in the car at the time the drugs were found. Nearly five months later, neither Anahi Ibanez, nor her husband Omar Perez have been arrested. According to the discovery produced by the government, Ms. Zamorano

---

[7] *Emergency Declarations Issued Across US Due to Coronavirus Vary Widely in Scope*, Colorado Public Radio (March 12, 2020), https://www.cpr.org/2020/03/12/emergency-declarations-being-issued-across-u-s-vary-widely-in-scope/.

[8] *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 2020 WL 1320886, at *12 (2nd Cir. March 20, 2020).

herself took sole responsibility for the narcotics in the car and was adamant that her daughter and son-in-law did not know about the drugs.

That Ms. Ibanez and Mr. Perez had no knowledge of Ms. Zamorano's intention to transport drugs make sense, under the circumstances. First, Ms. Zamorano *does* have relatives in the Minneapolis area with whom the family legitimately planned to stay. Second, Ms. Zamorano has never before transported drugs, and her family had no reason to believe she would be acting as a mule on this occasion. Finally, Ms. Ibanez and Mr. Perez themselves have no criminal history and no knowledge of the drug trafficking trade, so nothing about their mother's behavior would have raised suspicion.

Counsel has been able to further verify that Ms. Ibanez's residence is stable. Since December 11, 2019, counsel has been in regular contact with Ms. Ibanez.[9] She is a stay-at-home mother to her four sons. Mr. Perez works in construction and continues to work as an "essential" employee during this pandemic. They have a spare room where Ms. Zamorano could stay.

If this Court determines that living with Ms. Ibanez is not appropriate, Ms. Zamorano has another option: she could live with her long-time partner, Jose Luna. Counsel has also been in regular contact with Mr. Luna.[10] Mr. Luna reports that he is a United States citizen and recently retired after 30 years of service to Santa Clara County. Mr. Luna has no criminal history.

Counsel has explained to both Ms. Ibanez and Mr. Luna the responsibilities of serving as a third-party custodian, and each is willing to undertake that responsibility. Both Ms. Ibanez and Mr.

---

[9] Ms. Ibanez resides at 510 Stonewood Drive, Los Banos, California 93635 and can be reached by telephone at (209) 489-7689.
[10] Mr. Luna resides at 19 Alta Vista Way Santa, Clara, California and can be reached at (408) 841-3073.

Luna have committed to drive or otherwise aid in transporting Ms. Zamorano from Colorado to California, and back to Colorado for necessary court appearances.

At the detention hearing, this Court expressed reservation about releasing Ms. Zamorano to California, while the charges against her are pending in the District of Colorado, as she lacks connection to Colorado. This Court need not be concerned. Indeed, allowing out-of-state release is not unprecedented. For example, counsel has represented two women, one in the District of Colorado, and the other in the District of Wyoming, both of whom resided in California, neither of whom had *any* connection with the charging district, but for their offense. Both women were charged with violations of 21 U.S.C. § 841(a)(1) and (b)(1)(A), carrying a presumption of detention, and both were released on conditions of bond and supervised without incident in California.[11] In neither of the aforementioned cases did the government seek detention. *Id.*

### 2. There is a Global Pandemic which is, Quite Literally, Just Outside Ms. Zamorano's Cell Door.

As of April 1, 2020, there is at least one publically confirmed case among the Jefferson County jail staff. That person had direct contact with inmates. As we now know, that is probably not an isolated case. Receiving testing for COVID-19 is still the exception and those who do receive tests wait between and average of 7 to 10 days to receive results. Access to testing among inmate populations is even scarcer and several people with knowledge of the Jefferson County Detention Center reported to counsel that no tests have been administered to inmates. What is known is that once COVID-19 reaches prison populations, it spreads at an exponential rate.[12] Predictions for the

---

[11] *See United States v. Cantero,* 18-cr-00105-MSK-GPG, Doc. 12 (D.Colo, March 12, 2018); *United States v. Strobach-Robles,* 17-cr-00242-ABJ, Doc. 9 (D.Wyo. March 1, 2018).

[12] David Montgomery, *'Prisons are Bacteria Factories'; Elderly Most at Risk, Stateline,* PewTrusts (Mar. 25, 2020), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2020/03/25/prisons-are-bacteria-factorieselderly-most-at-risk.

spread of COVID-19 among prison and jail populations are not speculative, they are evidence-based. On March 18, 2020 one corrections officer at Rikers Island in New York State tested positive for COVID-19.[13] Ten days later, the number infected had risen to 104 staff and 132 incarcerated people were infected. Rikers Island now has an infection rate seven times higher than the rest of New York City. Similarly, the Cook County jail in Chicago went from two positive cases to 101 confirmed cases in one week.[14]

On March 23, 2020, the Center for Disease Control and Prevention (CDC) acknowledged that jails and prisons "present unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors."[15] Specifically, the CDC noted that many detention conditions create a heightened risk of danger to detainees including low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of prisoners to exercise effective disease prevention measures (e.g. social distancing and frequent hand-washing). *Id.* The CDC also points out that "[b]ecause many individuals infected with COVID-19 do not display symptoms, the virus could be present in facilities before cases are identified." *Id.*

On March 25, 2020, Colorado Governor Jared Polis heeded these expert warnings and issued Executive Order D 2020 016, to "mitigate the effects of the pandemic, prevent further

---

[13] *See* Jean Casella & Katie Rose Quandt, *US Jails Will Become Death Traps in the Coronavirus Pandemic*, The Guardian (Mar. 30, 2020), https://www.theguardian.com/commentisfree/2020/mar/30/jails-coronavirus-us-rikers-island ("From a public health and public safety standpoint, the solution to this crisis is quite simple: let them go.").

[14] *See* Timothy Williams et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, NY Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html) ("*Jails Are Petri Dishes*").

[15] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Center for Disease Control (March 23, 2020), at p2, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html, attached as Ex. D.

spread, and protect against overwhelming our healthcare resources." The Order was crafted to allow the state-run facilities in Colorado to drastically reduce their inmate population. Jefferson County Sheriff's Department complied, but this response may have come too late.

Even at reduced capacity, there is an inability to practice social distancing in jails. Medical experts have repeatedly and unanimously concluded that the most effective way to avoid contracting the virus is to practice "social distancing" by avoiding coming within six feet of other people, including those who show no symptoms of illness. The risk caused by the inability to physically distance is compounded by the fact that pretrial detention facilities see a daily flow of people entering and leaving the facility who could be carrying the virus by asympotomatic.[16] Thus, while state offenders with more serious criminal history were released, Ms. Zamorano, a Marshal inmate in a county-run facility, remains incarcerated, and at risk.

Just as the rapid spread of COVID-19 for inmate populations is based in fact, not conjecture, so too is the inability of Jefferson County jail to address that virus. Even in the best of times, jails and prisons lack the appropriate staffing and infrastructure to address inmate medical needs.[17]

---

[16] *See* Mar. 25, 2020 Ltr. from Johns Hopkins Faculty to Maryland Gov. Hogan ("Hopkins Faculty Ltr."), *available at* https://bioethics.jhu.edu/wp-content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf; *See also United States v. Davis,* No. 20-cr-00009-ELH (D. Md. Mar. 30, 2020); *United States v. Harris*, No. 19-356, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020) ("The risk of the spread of the virus in the jail is palpable . . . ."); *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020) ("The risk of contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious."); *United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020) ("[I]t is not possible for a medically vulnerable inmate . . . to isolate himself in [an] institutional setting as recommended by the CDC.").
[17] *See, e.g.*, U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf.

Ms. Zamorano herself has not received much-needed medical attention. She underwent invasive gallbladder removal surgery in 2018. Exhibit B.[18] Since she arrived at the Jefferson County detention center, Ms. Zamorano has experienced severe abdominal pain, which she believes is related to complications from her surgery. She has voiced concern and sought access to medical attention several times, without success. On March 29, 2020, another inmate at Jefferson County reached out to Ms. Ibanez to express concern that Ms. Zamorano was not receiving adequate medical attention. The inmate reported that Ms. Zamorano was in serious pain, but the guards failed to acknowledge her. There is nothing to suggest that the Jefferson County detention center is equipped to handle Ms. Zamorano's medical care, or to support the care and treatment of inmates who contract COVID-19.

### IV.     COVID-19 Threatens Ms. Zamorano's Right to Effective Assistance of Counsel.

Beyond the well-documented risk to Ms. Zamorano's heath, COVID-19 poses a threat to Ms. Zamorano's access to counsel. Jefferson County has ceased all in-person legal visits and set up a phone procedure for attorney visits. But these mitigation efforts must be considered in light of Ms. Zamorano's Sixth Amendment rights. Various technological alternatives to in-person meetings, such as FaceTime and Zoom, are not available to incarcerated people. The disruption this causes to the attorney-client relationship, and counsel's ability to effectively represent Ms. Zamorano, cannot be understated.[19]

---

[18] Medical Records from Advanced Surgicare.

[19] *See United States v. Davis*, No. 1:20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) ("Even though access to counsel is not a specified factor in the Bail Reform Act, the Court has considered it in its decision [ordering release].").

V.      **Courts Agree that the Risk of Contracting COVID-19 While In Custody Warrants Release of Pretrial Detainees in Many Cases.**

Federal Judges across the country are listening to the experts and releasing inmates in light of the pandemic. Here are some recent, notable examples:

a.  *United States v Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in sua sponte order extending time to self-surrender: "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided.");

b.  *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19");

c.  *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic");

d.  *In re Womanrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail.");

e.  *United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19);

f.  *United States v. Barkwoman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkwoman . . . is admitted to the inmate population of the Wahoe County Detention Facility");

g.  *United States v. Copeland*, No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic");

h.  *Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (*sua sponte* releasing detainee from immigration detention "[I]n light of the rapidly escalating public health crisis");

i.  *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced

that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement");

j.  *Basank v. Decker*, No. 20-cv-2518 (S.D.N.Y. March 26, 2020) (releasing high-risk plaintiffs because "the nature of detention facilities makes exposure and spread of [coronavirus] particularly harmful.");

k.  *United States v. Grobwoman*, No. 18-cr-20989, Dkt. No. 397 (S.D. Fla. Mar. 29, 2020) (releasing defendant convicted after trial of fraud scheme in light of "extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for [the defendant] and others to practice the social distancing measures which government, public health and medical officials all advocate");

l.  *United States v. Kennedy*, No. 5:18-cr-20315, Dkt. No. 77 (E.D. Mich. Mar. 27, 2020) (district court revokes Magistrate's detention order under 18 U.S.C. §3145(b) for defendant who had violated pretrial release because "the COVID-19 pandemic constitutes an independent compelling reason" for temporary release and "is *necessary* for Defendant to prepare his pre-sentence defense");

m.  *United States v. Powell*, No. 1:94-cr-316-ESH (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case);

n.  *United States v. Mclean*, No. 19-cr-380, Dkt. No. (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. §3142(e), but tilts the balance in favor of release.")

o.  *United States v. Davis*, No. 1:20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) (releasing defendant due to the "urgent priority" of decarcerating, to protect both the defendant and the community, and to preserve Sixth Amendment rights in this perilous time).

p.  *Fraihat v. Wolf*, No. 20-CV-590 (C.D. Cal. Mar. 30, 2020) (noting risk of asymptomatic spread and unsafe conditions in immigration detention mean "[t]he balance of equities tip sharply in [Fraihat's] favor" and thus ordering release**.**

q.  *United States v. Bolston*, Case No. 1:18-cr-382-MLB, Dkt. No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justif[y] his immediate release from custody")

VI.   **The Compelling Circumstance Presented by COVID-19, and the Additional Assurances about Ms. Zamorano's Verified Release Plan, Support Release.**

Under the Bail Reform Act, this Court must consider four factors in determining whether the exceptional step of detention is necessary: 1) the nature and circumstances of the offense charged; 2) the weight of the evidence against the person; 3) the history and characteristics of the person, including their physical and mental health; and 4) the nature and seriousness of the danger to any person or the community that would be posed by the persons release. 18 U.S.C. § 3142(g). If a person is ordered detained "[t]he judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or other appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. §3142(i). In this case, the spread of COVID-19 to Jefferson County provides a compelling reason for her release. In light of that, and the additional information provided at § II, 1., the four factors weigh in favor of Ms. Zamorano's release.

1.   **The Nature and Circumstances of the Charged Offense and the Weight of the Evidence Against Ms. Zamorano.**

The first two factors are best considered together. Ms. Zamorano is entitled to a presumption of innocence. But this Court found that the weight of the evidence against Ms. Zamorano is strong. After her arrest, Ms. Zamorano stated that she'd never before transported drugs and only agreed to participate out of financial desperation. Indeed, there is no allegation that Ms. Zamorano has been actively involved in a long-standing drug trafficking operation.  Even if all the evidence against Ms. Zamorano is to be believed, it supports the conclusion that she was a one-time mule, not a drug trafficker. The offense conduct here suggests Ms. Zamorano was desperate; it is not consistent with inherent dangerousness or criminality. Ms. Zamorano is 48 years-old and prior

to her arrest in this case, she had not sustained even a traffic ticket. Taken together, therefore, even if the weight of the evidence is strong, the nature and circumstances of the offense counsel in favor of releasing Ms. Zamorano.

### 2. Ms. Zamorano's History and Characteristics Favor Release.

Ms. Zamorano's history and characteristics weigh heavily in favor of her release. Ms. Zamorano legally immigrated to the United States nearly 20 years ago.[20] She raised her children in Los Banos, California and has eleven grandchildren in that area. She is beloved by family and friends alike and both her daughter and partner have both agreed to serve as Ms. Zamorano's third-party custodian, should the Court order that condition.

The COVID-19 public health emergency further bears on this analysis as it factors into Ms. Zamorano's "physical and mental health." 18 U.S.C. § 3142(g)(3)(A). According to a recent decision out of the District of Maryland:

> If released, Davis will be removed from a custodial setting where the risk of infection is higher for everyone, including the healthy, and he will live in the community where he is able to practice social distancing, self-quarantine, self-isolate if infected, and seek medical treatment if necessary. The Court finds that the "physical and mental health" factor cuts in favor of release for any defendant during this public health crisis.

*United States v. Davis*, No. 1:20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020).

### 3. Ms. Zamorano is not a Danger to the Community and is Herself in Danger.

The nature and seriousness of Ms. Zamorano's dangerousness needs to be analyzed in light of the current health crisis. This Court must balance the public health and safety risk posed by the continued incarceration of Ms. Zamorano in a crowded correctional facility

---

[20] The government proffered that Ms. Zamorano has an ICE detainer, but no discovery about Ms. Zamorano's immigration status has been produced to counsel.

13

with known exposure to COVID-19, against any community safety risk posed by her release.[21] Ms. Zamorano does not pose a danger to the community such that releasing her would be more dangerous than keeping her detained where she is herself exposed to significant danger. *Id.*[22] The danger to Ms. Zamorano is particularly serious in light of her age (48), recent surgery, chronic pain, and ongoing morbid obesity – all of these factors suggest that she falls into the category of people for whom COVID-19 is high-risk with increased fatality rates.

At her detention hearing, government pointed to the generic danger of transporting drugs without identifying the exact nature and seriousness of the danger of Ms. Zamorano's specific conduct. Even if this Court identifies a specific danger and the degree of seriousness, the Court then must consider available release conditions that will address those concerns and "reasonably assure" the safety of the community.

Again, Ms. Zamorano has no prior criminal convictions and no history of violence. She did not engage in violent acts during the alleged criminal conduct. To the contrary, she was entirely compliant with law enforcement upon arrest. To the extent there are concerns about danger to the community if she were released – that she would again act as a drug

---

[21] *See Karr v. State,* No. A-13630, 2020 WL 1456469 *3 (Alaska Ct. App. Mar. 24, 2020); *United States v. Kennedy,* No. 18-20315 (E.D. Mich. Mar 27, 2020).

[22] *See also United States v. McLean*, Crim. No. 19-380, slip op. at 4 (D.D.C. Mar. 28, 2020) ("Defendant's continued pretrial detention poses a risk to community safety, which the Court must weigh against the risk posed by his release to home confinement . . ."); *see also United States v. Stephens*, No. 15-cr-95-AJN, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("Although there is not yet a known outbreak [of COVID-19] among the jail and prison populations, inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop . . . A comprehensive view of the danger the Defendant poses to the community requires considering all factors—including this one—on a case-by-case basis.").

14

mule – that can be addressed with release conditions. Ms. Zamorano's continued

incarceration clearly poses a greater risk to community safety than her release.[23]

      The Court can fashion a number of conditions that will ensure community safety including:

a third-party custodian, community supervision, GPS monitoring, and even home-confinement,

allowing Ms. Zamorano to leave her home only for essential activities such as medical appointments.

The Court can also order probation officers to visit Ms. Zamorano's proposed residence. These

visits can occur before and during her release.

## VII.    Conclusion

      For the reasons stated herein, Ms. Zamorano respectfully requests an order granting her

temporary release from detention pursuant to 18 U.S.C. §3142(i), under any conditions of release

deemed necessary, pending further hearing(s) and order of the court.

---

[23] *See Harris*, 2020 WL 1482342, at *1 ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on these strict conditions."); *United States v. Jaffee*, Crim. No. 19-cr-88 (D.D.C. Mar. 26, 2020) (minute order concluding that release to home confinement on high intensity supervision was appropriate after considering "all of the factors specified in 18 U.S.C. 3142(g), and, in particular, the overall safety of the community" because "the Court is now convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement.").

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2020, I electronically filed the foregoing

**MOTION TO RECONSIDER PRETRIAL DETENTION ORDER**
**UNDER 18 U.S.C. § 3142(i)**

with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

> Conor Flanigan, Assistant United States Attorney
> conor.flanigan @usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

> Ms. Irma Zamorano (U.S. Mail)

s/ Laura H. Suelau
LAURA H. SUELAU
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado  80202
Telephone:  (603) 294-7002
FAX:  (603) 294-1192
laura.suelau@fd.org
Attorney for Defendant